You are adjourned five minutes for rebuttal. Yes, sir. May it please the court, this court should reverse the decision of the lower court under one of two theories. And that is that the court lacks jurisdiction to entertain. The Court of Federal Claims lacked jurisdiction to entertain INNOVAIR's takings claim because Congress provided that district courts should have the exclusive jurisdiction to adjudicate what happens when the government seizes and disposes of property pursuant to its law enforcement powers. But the district court found no standing. The initial decision of the INNOVAIR tried to intervene in that first case. Your Honor, the initial decision was that there was no standing. However, that was reversed by the Ninth Circuit and remanded. And it went through the entire adjudicative process. And there was a determination that INNOVAIR was entitled to have the return of the rest of the bond that was posted by Basler Turbo Conversions. So in fact, INNOVAIR had complete adjudication of its rights in the Arizona District Court. How is this case different than a Amerisource? And as I recall, the government prevailed in Amerisource. But there was no jurisdictional claim. There was no jurisdiction on the takings claim. So why is there no jurisdiction here? And why was there jurisdiction in that case? The Amerisource case went on the issue of failure to state a cause of action. And that was argued under the Venice v. Michigan line of attack. And we also raised that argument here in the court below. And we're arguing that this court should reverse the lower court's decision in the alternative based on- But your line here is first and foremost, right? That there's no jurisdiction over the takings claim. That's correct, Your Honor. And that argument would have had as much juice in Amerisource, would it not? And therefore, I'm just curious or wondering why the government didn't pursue it. Why, if jurisdiction is such a clear issue for us to go off on this case, why it never came up in Amerisource? I don't know the exact disposition of the Amerisource case below as to why Amerisource in the initial matter did not have its matter adjudicated before the district court. But in this case, Inover did have its rights adjudicated in the district court. And there's no reason for the Court of Federal Claims to have assumed jurisdiction. Inover had received the return of the posted bond by Basler-Cherbow conversions. And so all of the rights under the Controlled Substances Act were adjudicated in the district court. And for that reason, this court should affirm the decision, should reverse the decision below based upon the Vereda and the Alistiarte line of case which provide that where Congress has established a certain remedy in an exclusive jurisdiction, say in the district court under the Controlled Substances Act, then the Court of Federal Claims should stay its hands and not try to reconsider a decision below. Because that's an effect. So the government's position then, as I understand it, is that under Vereda, that Inover should have continued its objection to the government's agreement on the race, the value of the bond, should have appealed. It did object, as I understand it. It should have appealed that determination. That's correct, Your Honor. That's the opportunity that it had in accordance with the overall scheme under the Controlled Substances Act. And for that reason, the Court of Federal Claims has no jurisdiction. That's correct. There's an entire set of procedures that were, in fact, followed in the district court. Even if they hadn't been followed for some reason because Inover failed to appear, the statutory scheme of procedures provides that all of these matters, when a property is seized and disposed of pursuant to the government's Law Enforcement Act, that should be adjudicated in the district court and not subsequently in the Court of Federal Claims. So it's not necessary in your view whether or not, I mean, in this case, you've got it all, it seems, because they pursued it in the district court. They went up three times. But let's assume he had never filed in the district court. And let's assume by the time he goes to the CFC, the statute of limitations had run. So there's really no practical ability for him to do this. Is your view that, given that there's a statutory scheme that gives him this right, that in and of itself forecloses jurisdiction in the Court of Federal Claims? That's correct, Your Honor. That is our position. And the Court of Federal Claims has held so in a number of other cases involving the Controlled Substances Act. I mean, in this case, this is an unusual case in which, in fact, Inover did go through the procedures and did have it stay in court. But now it claims that it somehow was, I'm not sure what its basis of its argument is, but it claims that it should also have a second bite of the apple at the Court of Federal Claims. And that is not the case. Well, I'm still puzzled, though, by one aspect of the case, and the fact that the district court transferred the TLA and it said that Inover did not have standing to object. It did it over Inover's objection. The TLA was transferred, and then that case was appealed to the Ninth Circuit. The Ninth Circuit sent it back to the district court saying, you do have jurisdiction. They have standing to challenge. By that time, the TLA was already out of the case because it had been transferred to BTC. However, let me finish one more aspect of it. Moreover, when they went back to the district court, they were told that you only have jurisdiction up to the bond raise, which was $1.3 million. So the value of the TLA was not litigated before the district court because it was not present. Your Honor, there's a missing point that the court is missing from the scenario. When the United States entered into a stipulated substitute rest bond agreement with Basler Turbo Conversions, and in fact, Inover was given the same opportunity that Basler Turbo Conversions was given to enter into a stipulated substitute rest bond agreement with the United States, it declined to pursue that at a certain point. So the government entered into negotiations with Basler Turbo Conversions. And then the government submitted that stipulated substitute rest bond to the court. The court entertained the arguments by Inover. Inover raised a number of arguments. It claimed that the court lacked jurisdiction. It claimed that Basler Turbo Conversions itself didn't have jurisdiction. It claimed that the bond was too low, not that it was too high, not that it was too low. In other words, it claimed that the bond was higher than the technology license agreement was, the value of that was to the United States. And it could have litigated the issue of whether or not the bond represented the fair market value of the licensing agreement itself. But it didn't litigate that issue. It actually claimed that the, as I said, that the bond was too high. And in addition to that, the bond agreement provided that Inover's rights were forever relinquished if the court approved the bond. Inover raised that argument with the district court, and the district court said, no, that's not what's happening here. In fact, Inover, you have the right to litigate this issue in the Wisconsin district court. And that was the ruling of the district court. Inover did not appeal that decision of the Arizona district court. Could they have asked for the return to the TLA at that point? It could, yes, that could have, it could have requested the district court to provide that instead of always having that complete loss of the TLA to Basler Turbo Conversions, it could have said to the district court, let's have, at the end of these proceedings, let's have the TLA return to Inover. But it didn't ask for that. And it didn't appeal any of the decision, the May 21st, 1992 decision of the Arizona district court, where in fact, the court agreed with the stipulated substitute rest bond. So Inover had the opportunity, regardless of the standing issue, it had the opportunity to litigate this issue, it was litigated, and it could have appealed that decision, but it didn't do that. Instead, it waited and then tried to seek additional funds from the Court of Federal Claims. And what the Vereda decision tells us, and the Alistiarte decision tell us, is that the district court has the exclusive right to adjudicate these matters, not the Court of Federal Claims. Court of Federal Claims must stay its hands. And for that reason, this court should reverse the decision below. In addition, we argue in the alternative along the lines of the Amerisource decision. And that is that when property is seized and disposed of pursuant to the government's law enforcement powers, that's a police power acquisition of the property, and it's not taken for public use. It was the Venice v. Michigan decision, which said that where property is not taken for public use, then there is no right to receive recovery. And so that Venice decision was cited in both the Acadia decision and the Amerisource decision by this court. The exercise of police power can be a taking under certain circumstances. In theory, it can, yes, Your Honor. And there was one case that held that it was, but there have been no cases subsequent to that that we are aware of. You're suggesting that we say that it can never be a taking, right? No, I'm not saying that, Your Honor, because in fact, the Amerisource decision recognizes that if the procedural due process rights are not granted in a particular instance, there may be a reason for this court to, or for the Court of Federal Claims to look at the issue and determine whether or not there is a taking in that case. But that is not the case here. As I previously argued, there were all kinds of opportunities for Inover to seek the return of the TLA, to have received fair market value, the value of the TLA from the bond when the forfeiture proceedings were concluded in the Arizona District Court, and it did not- Save you time for rebuttal? Yes, Your Honor. Thank you, Your Honor. May it please the court, Chris Bartolomucci for Appellee Inover. Addressing the question of the effect of Inover's failure to appeal the race bond order, which seems to be an issue before the court, Inover did not appeal that order, but Inover did object to the race bond. It opposed it, but the district court overruled those objections. The fact that Inover did not appeal has no legal significance in this case, because it would only matter if it operated as a waiver of some sort, but it clearly did not operate as a waiver of Inover's right to argue that it was an innocent owner of the property, because the forfeiture proceedings continued, and Inover did exactly that. It argued that it was an innocent owner, and it prevailed on that issue. Could have, at that point in time, asked the district court, we are innocent third parties, that's our property, we would like it back. They make that argument before the district court. We want the property back. Well, Inover, again, opposed the race bond, opposed the transfer, but once the transfer took place, the property was gone, and there was no way to get it back. There's no way the district court could have, at that point, ordered the property returned. It had been substituted for the race bond, and frankly, at that point, the government had assumed the risk that Inover might actually prevail, as it did, in the forfeiture proceedings, and prove it was an innocent owner, so the government assumed the risk that Inover would win in the forfeiture proceedings, and proved that the value of the TLA exceeded the value of the race bond, which is exactly what happened. Wasn't Inover involved, though, in the structuring of the race bond? No, the race bond. The second time around? Not at all, your honor. The race bond was negotiated in secret between the government and the Basler entities. Inover was attempting to oppose its own bond, and the joint appendix at pages 76 and 86 reflect that Inover actually ultimately offered to post a bond on the exact same terms as Basler, but the government simply decided not to deal with Inover. They preferred, they had this deal worked out with the Basler entities, and wanted to transfer the TLA to them. So Inover tried to post a bond. The government didn't want to deal with Inover. Inover opposed the race bond. The district court approved it in any event. How much was the race bond that Inover was proposing at that time? I believe its initial offer, as the record reflects, was somewhat less, 1.275 million, but then again, the joint appendix at 86, 76, excuse me, reflects that Inover offered to post a bond on the same terms as Basler, that is, for 1.375 million. Is that considered to be the fair market value of the TLA? No, no, this is a very important point that I want to underscore. The TLA was not set, the race bond was not set at the value of the TLA. The race bond was set at the amount of money that the government claimed was forfeitable. It had this theory that Inover had received 1.375 million dollars from Air Columbia, and had allegedly applied that amount of money toward the TLA. The government said, this is the amount of money which we think is forfeitable to us, so that's gonna be the bond amount. There was never an effort made at the time of the race bond to appraise the TLA or determine its market value. Judge Smith made an express finding on this point, and this is at page 44 of the joint appendix, that the TLA was designed, that the race bond, excuse me, was designed to secure the government's interest. It was not an arm's length transaction with a willing seller. What about the Wisconsin litigation? Didn't your client get compensated in that proceeding with the value of his interest in the TLA? No, the Wisconsin litigation actually was commenced prior to the seizure of the TLA, and it had to do with the various claims of a breach of fiduciary duties between Inover and its business partner. And what was the amount that you were awarded, what was that for? Well, there wasn't an award, there was a settlement. Okay, what was the settlement for? What was the money you were asking for in the complaint? The complaint, I believe, asked for equitable relief in the main. I don't think the complaint asked for a some certain. The outcome of that proceeding was simply that Inover would continue to have the right to pursue its takings claim. Basler had been a part owner of the TLA, so prior to the settlement, Basler as well as Inover, in theory, could have had a takings claim. But the settlement agreement said, we'll resolve this litigation. Inover, you get 100% of the right to pursue the takings claim, and the parties settled their agreement. So I think the settlement agreement in the Wisconsin litigation really is of no moment. It's not an issue. What is wrong with the government's reading of a RETA, that when you have this separate statutory scheme, particularly punctuated by the fact that in this case, your client actually pursued that scheme, but you've got a Congress telling you how and what to do when, when something like this happens. How can you override that by going to the court? Judge Post, there's an enormous difference between VERITA and this case, which is that in VERITA, the property at issue was actually held to be forfeitable. The property owner there lost in the forfeiture proceedings, and this court said, you can't come to the Court of Federal Claims and collaterally attack the forfeiture judgment that said that your property is forfeitable. In this case, we are not challenging the district court's judgment because- But the question is, why the court said that? And do you disagree with the government's characterization that the court said that, because Congress's intent is clearly demonstrated by the fact that they set up this entirely separate statutory scheme with relief in the federal district courts? Well, I think what VERITA says, and I do disagree with their reading of it, VERITA says is that you can't quarrel with the decision in the separate forfeiture action, and we are not. We won the forfeiture proceeding. We proved that we were an innocent owner of this property. So our takings claim comes to the Court of Federal Claims without any collateral attack upon the forfeiture proceedings in the district court or in the Ninth Circuit. And the value is greater. I mean, the difference here is you got compensated something in the district courts, and now you just want a different evaluation of what you're entitled to. Well, the TLA, again, the race bond. Am I right about that? I mean, it's a question of how much you're being compensated. You were compensated in part, in your view, in the district court, and now you want a different valuation to get more compensation for the same thing, right? Yes, but let me explain. We received the race bond, which was not pegged at the value of the TLA. It was pegged at the value of the government's alleged forfeitable interest. But the determination of the race bond and the whole proceeding associated with that required court approval. All of that was done pursuant to the grand scheme of the Controlled Substances Act. Yes, but in this era, the forfeiture laws were a patchwork, which is exactly why Congress, in 2000, enacted the Civil Asset Forfeiture Reform Act, because there were holes in the scheme. I would not characterize it as a comprehensive, coherent scheme, because there were cases, and this is one, in which innocent owners were not fully compensated for the value of their property. I don't understand, where is that standard coming from? You don't get to apply for RETA when you say that it isn't a comprehensive and coherent scheme. Are we supposed to evaluate all statutes to decide whether they pass that test? No, our reading of RETA is that you cannot challenge the judgment of a forfeiture court. When the district court has said your property is forfeitable, RETA says you can't come into the Court of Federal Claims and say we should be compensated nonetheless. So that comprehensive, if you want to call it a comprehensive scheme, we are not challenging the outcome of that scheme in terms of the judgment about whether the property was forfeitable. Innovera prevailed on its innocent owner defense, which in an ordinary case would entitle it to the return of its property. But in this case, what makes this case very unusual, in fact, unique, is that the government had already transferred ownership, irrevocably, of the TLA to a third party. That was over your objection. It was. Did you move to have the property returned at that point? Before it was transferred? Yes, because that occurred when the race bond was up for consideration. But the Ninth Circuit got it back to you, right? I mean, the Ninth Circuit concluded that you in fact did have a property right in the TLA. That's right. So the problem you're complaining about was reversed, was taken care of by the Ninth Circuit. No, the Ninth Circuit said that this is an in rem proceeding and that the district court was without jurisdiction to award the value of the race, except that all that it could do was give us the race bond. So that was the extent of the district court's jurisdiction, was to give us the race bond, which it did. But that was the second time around, not the first. That was after the second appeal. The first time to the Ninth Circuit you were granted standing to act. Correct, initially the district court said, oh, your property's gone, you have no standing here. And the government convinced them of that. The Ninth Circuit in its first opinion said, we're mystified. How can you say that they have no standing when you took their property and you transferred it to a third party? So the case goes back to the district court. The district court agrees with us that we are an innocent owner. And the district court actually then set out to value the TLA, because it knew that the race bond was never an effort to replicate the value of the TLA. But when you were up before the Ninth Circuit the first time around, the Ninth Circuit could have said, go back to the district court and get your property back there. They could have said that. They didn't. They gave you standing to sue on the property at that point in time. In the forfeiture case. Did you request the Ninth Circuit to return the property to the district court, that you still had an interest in the property? Otherwise, the issue would be moot? Well, it was premature. It would have been premature at that point to make a request for the property, because Inover had not yet proven that it was an innocent owner. That occurred later in the proceedings after the remand. The issue on appeal the first time around was whether Inover had standing at all to object to the transfer of its property and to continue to defend on the ground that it was an innocent owner. The Ninth Circuit said, yes, you do have standing. Go back. And Inover then prevailed in the district court, proved it was an innocent owner. The Ninth Circuit agreed with that. And none of that is contested. Inover's takings claim does not collaterally challenge the judgment of the district court or either of the Ninth Circuit's judgment. Inover's takings claim is based upon the fact that the race bond was never meant to reflect the fair market value of the technology license agreement. Well, this leads to the question I wanted to ask. And that is, in the proceedings with regard to the race bond, in paragraph 4 to the objections you filed, you even forecast what might happen. You said, if BTC is allowed to post a bond for the technology license agreement, the government will not be able to return Inover's asset in the same condition as it was at the time of the seizure. And so it seemed to me that you raised the very concern that We did raise that concern. And so my question is, why didn't you follow up and appeal the adverse ruling with respect to that race bond? Were you in any way foreclosed from appealing? Not that I'm aware of. I think Inover could have attempted an interlocutory appeal at that point. So isn't what you requested the Court of Federal Claims to do in this takings case an effort to undermine or re-litigate the issue that was before the district court in the race bond proceeding? Not at all. Because again, the race bond was designed to protect the government's interest. It was not designed to be a remedy for the taking. That was never its purpose. And its only purpose was to secure the amount of money that the government felt was forfeitable. So it was not ever intended to protect Inover's interest or to substitute to provide a remedy for the taking. Just stepping back a bit, when the government says, I'm going to take your property, a property owner is entitled to just compensation whether or not you try to stop the taking. When the government takes your property, you get just compensation even if you don't oppose their effort. In this case, Inover did oppose. It opposed the race bond. It objected to it. It simply lost that proceeding. So the TLA was substituted for the race bond. But Inover didn't commit any waiver at that point. It continued to defend in the forfeiture case on the ground that it was an innocent owner. And it continued to argue that the full value of the TLA was not captured by the race bond, that in fact the TLA's value far exceeded the race bond. Are you saying that any time the government participates in an action in connection with a CSA proceeding on a race bond, that should facts reveal later that that race bond undervalues the property in question, that there is a taking? Well, I'm not saying that. Is this now a rule that there's a taking any time there happens to be an undervaluation in a race bond matter in connection with the CSA proceeding? I'm not saying that. But I am saying in this case, the race bond was never intended to be a valuation of the TLA. And that's why this case is fundamentally different from one in which a bond was set at the value of the property. This would be a different case if that was the purpose and intent of the race bond. But the record is clear in this case that the race bond was only meant to secure the government's interest. It was never intended to reflect the fair market value of the TLA. The government simply took a valuable piece of property, gave it to a third party, and then proceeded to lose the forfeiture proceeding. Innovaire proved that it was an innocent owner of that property. And so ordinarily, the property would come back to it. But it didn't. So its property was taking. And so then the only question is just compensation. What is the fair value of that property? It was not the value of the race bond because How should we integrate the settlement, then, of the Wisconsin case in which Innovaire did receive additional funds? That was not a real value for the TLA at that point? The Wisconsin case was not a suit over the taking of the TLA. In fact, that suit was filed before the TLA was seized. That was a suit based on unrelated breaches of contract and fiduciary duty. So it was not a separate suit over the TLA, which is exactly why the government has not so argued on appeal in this case. There were intercompany transfers between the Basler entities that Innovaire claimed were in violation of its rights as a fiduciary. And that was the basis for the Wisconsin. Weren't you pursuing your ownership rights in the TLA? No. No, the Wisconsin litigation, again, was based on breaches of contract and alleged violations of fiduciary duty that took place before the loss of the TLA. So the Wisconsin litigation was separate. In fact, I would say the Wisconsin litigation is reflective of animosity between the Basler and Innovaire that gave rise to the seizure of the TLA. It was soon after the Wisconsin litigation was filed that Basler approached the government and said, why don't you seize this TLA? Here's a theory under which it's forfeitable. And then you can transfer it to us, and we'll use it. So that's what happened. But that happened after the events that gave rise to the Wisconsin litigation and after the complaint in that case was filed. Again, that case was settled, so there's no follow-up. There were a couple cases in Wisconsin, weren't there? They were consolidated cases. I think there was a state case. They all ended up in federal court with claims and counterclaims. But again, those events preceded the seizure and taking of the TLA and did not directly relate to the seizure and taking of the TLA. Those cases were all settled, so there's no court judgment in Wisconsin that has to be taken into account. But the Wisconsin case, though, started subsequent to the original taking of the four airplanes. The in-room action already had started in district court in Arizona. I believe that's right. But the TLA itself had not yet been seized, because that did not occur until July 16, 1991. And the Wisconsin action was started in May of 1991. Correct. Thank you. Thank you. Why don't you add two minutes to Ms. Boyd's time to even it up? Thank you, Your Honor. There are a couple of facts that I would like to sort of clarify for the record. First of all, in connection with the Wisconsin litigation, Inover was contesting the fact that Basler Turbo Conversions refused to honor its agreement, the TLA agreement requiring Basler Turbo Conversions to turn over the technology to Inover. So Inover was unable to manufacture BT-67s, because it did not have the underlying technology, the drawings, the particular equipment that was used to manufacture that. So in effect, the heart of the relationship was at issue in the Wisconsin matter. And moreover, as the court has already observed, there was a settlement to the Wisconsin litigations. And that involved the payment by Basler Turbo Conversions of $2.75 million, and the allowance for Inover to prosecute recovery of the bond in the Arizona District Court. So initially, when the Arizona District Court said, I'm not deciding the ownership of the rights under the TLA, in effect, the court was correct, because those also got litigated in the Wisconsin matter. And the party settled the dispute by having Basler Turbo Conversions pay Inover, and also give Inover the right to seek the return of the substitute, the bond that was posted by Basler Turbo Conversions. Another point that I'd like to address is that regardless of whether the value of the bond in the Arizona District Court was the government's interest, in fact, under the Controlled Substances Act, it provides that the bond posted should be the fair market value of the property that is being returned to the owner. So Inover had the right to pursue making sure that the bond was the fair market value of the TLA, and it didn't pursue that. In fact, as I mentioned earlier, it argued that the bond was too high. Inover, in addition, had an opportunity to pursue the return of the TLA under 28 U.S.C. Section 2465, which gives the parties the rights in the Arizona District Court proceedings to seek the return of the property following a forfeiture proceeding. So as we pointed out in the first part of our argument, the Controlled Substances Act provided Inover all of the rights and opportunities that it could have wanted, and it did not pursue all of those by virtue of not seeking an appeal of the Arizona District Court's decision or pursuing the right to have the return of the TLA under the Section 2465. So this court should reverse the decision below because of the Vereda decision and in addition to the Alistiarity of how it applies in this particular case. Thank you. Thank you.